**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Edward Nemec,

Plaintiff,

Civ. No. 14-4450 (RHK/LIB)
**MEMORANDUM OPINION AND ORDER**

v.

Wal-Mart Associates, Inc., d/b/a
Wal-Mart Store #1757,

Defendant.

---

Barbara Jean Felt, Clayton D. Halunen, Stephen M. Premo, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Angela Beranek Brandt, Margaret Jennings Meier, Larson King, LLP, St. Paul, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Edward Nemec worked for Defendant Wal-Mart Associates, Inc. d/b/a Wal-Mart Store #1757 ("Wal-Mart") as the pharmacy manager in its Hermantown, Minnesota, store for more than 21 years. After Wal-Mart terminated his employment in November 2013, he commenced this action alleging age discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq*. Presently before the Court is Wal-Mart's Motion for Summary Judgment. For the reasons that follow, the Motion will be granted.

## BACKGROUND

When viewed in the light most favorable to Nemec, the record reveals the following facts, most of which are undisputed.

### I. Nemec and Wal-Mart

Nemec was born in 1953 and has been a licensed pharmacist since 1978. (Felt Decl. Ex. 19; Nemec Dep. at 5.) Wal-Mart hired him to manage its Hermantown pharmacy in 1992. (Brandt Decl. Ex. B.) Managers oversee all pharmacy operations, including the prescription-filling process, inventory control, and supervision of pharmacy staff. (Id. Exs. F, L.) Over the years, Nemec received positive reviews for his interpersonal skills and obtained steady salary increases, although managers noted the Hermantown pharmacy often failed to meet goals for financial performance and "customer experience." (Id.; Felt Decl. Ex. 1.)[1] At all times pertinent to this case, Nemec's immediate supervisor was Lee Reichenbach, Wal-Mart's Health and Wellness Director for market 185 (an area comprising ten Wal-Mart stores in northern Minnesota and Wisconsin), and Reichenbach reported to Charles Hedden, Wal-Mart's Regional Health and Wellness Director.

Wal-Mart utilizes certain Standard Operational Procedures (SOPs) to govern pharmacy operations; they are contained in its Pharmacy Operations Manual (POM).

[1] Customer experience is a key metric for pharmacy managers and focuses on, among other things, accurate and speedy prescription filling. (Reichenbach Dep. at 31.) While Nemec points out his metric for "patient expectations met" was exceeding Wal-Mart's goal just before his discharge, other metrics comprising his customer-experience score fell below goal. (See Felt Decl. Ex. 16.) As one manager noted, "Hermantown was one of the lower performing pharmacies in the market." (Reichenbach Decl. ¶ 6.) Indeed, Nemec acknowledged in his deposition that the pharmacy was below market average in several categories shortly before his termination. (Nemec Dep. at 32-38.)

(Brandt Decl. Ex. D.) The POM covers everything from the routine, such as Wal-Mart's basic beliefs and tenets, to specific, detailed pharmacy operations, such as inventory and prescription filling. (Id.) It is maintained online through Wal-Mart's intranet website and is available to all employees electronically. (Reichenbach Dep. at 21-24.) Nemec was aware of the SOPs, received training on the POM, and knew he was required to comply with all of its provisions. (Nemec Dep. at 23-25; Brandt Decl. Ex. E.) As the pharmacy manager, he was also required to ensure that all pharmacy employees understood and followed the SOPs in the POM, even though it was quite large – several hundred pages when printed out – and was regularly being modified. (Brandt Decl. Exs. D, F; Reichenbach Dep. at 21.)

Of particular relevance to this case is a procedure known as "POM 1009," an SOP entitled "visual verification." POM 1009's purpose is to ensure the medication dispensed to a customer matches the medication that was prescribed. It requires visual verification of the dispensed medication by a pharmacist – accomplished by comparing the contents of a filled prescription bottle with a computer image of the proper medication. Once a match is confirmed, the pharmacist is directed to print a drug leaflet to be attached to the bag in which the bottle is placed, and the image disappears from the screen. (Reichenbach Decl. Ex. 3; Brandt Decl. Ex. J; Felt Decl. Exs. 24-25; Nemec Dep. at 115-16.)[2] This visual-verification process is important for accuracy because medication

[2] Nemec correctly notes that POM 1009 was modified shortly before his termination, in October 2013, but that modification did not materially alter the process for pharmacies such as Hermantown that had not migrated to Wal-Mart's new "Bagging Phase III" process. (Reichenbach Decl. ¶ 3; compare Felt Decl. Ex. 24 with Felt Decl. Ex. 25.)

bottles are initially filled by a pharmacy technician, not a pharmacist. (Nemec Dep. at 129.) The process also comports with administrative rules promulgated by the Minnesota Board of Pharmacy, which require a pharmacist to check the contents of a filled medicine bottle against computerized images to ensure that the dispensed medicine is a match. Minn. R. 6800.3100, subp. 3(A), (C).

## II. Nemec's interactions with Reichenbach and Hedden

In approximately February 2013, Reichenbach approached Nemec and asked him to resign as manager of the Hermantown pharmacy and become a staff pharmacist, also referred to as a "floater." (Nemec Dep. at 58-63; Nemec Decl. ¶ 4; see also Reichenbach Dep. at 79-85; Reichenbach Decl. ¶ 10.) "Floaters" are pharmacists who may or may not be full-time employees; they typically "float" between locations in the region to work on an as-needed basis. (Nemec Decl. ¶ 6; see also Suronen Decl. ¶ 4;[3] Reichenbach Dep. at 84.) According to Nemec, "the floater position was typically pushed on older pharmacists so that more hours could be given to younger pharmacists" (Nemec Decl. ¶ 7), although he proffers no evidence to corroborate that assertion.[4] Reichenbach did not

[3] Wal-Mart urges the Court not to consider the Declaration of Wayne Suronen, another former Wal-Mart pharmacy manager, because Nemec failed to identify him as a witness during discovery. (Reply at 8-9.) But the Court has considered the Declaration because doing so does not alter the outcome.

[4] Indeed, at oral argument Nemec's counsel described the floater position as "semi-retirement." And yet, in his deposition Nemec identified – "by hearsay" alone (Nemec Dep. at 101) – only three pharmacists he believed were "forced" into the floater position, two of whom (Michael Ziebell and Al Kostynyk) undisputedly *requested* the position change. (Kostynyk Decl. ¶ 3; Reichenbach Dep. at 164.) The third, Bernie Winter, transitioned from a pharmacy manager to a floater before Reichenbach began working for Wal-Mart in 2010. (Reichenbach Dep. at 164.) The only other "floater" Nemec could identify was Elizabeth Anderson, who is "significantly" younger than him. (Nemec Dep. at 43-44.) And Nemec testified he was also aware of "some"

tell Nemec the reason for his request, although it is undisputed the pharmacy was not meeting certain of its performance goals at that time. (Nemec Dep. at 59-62.)[5] When Nemec replied that he would not step down, Reichenbach then told him that he (Nemec) would be required to attend a manager retraining program. (Id. at 59-64.) Yet, Reichenbach later changed his mind and Nemec was not required to attend retraining. (Id.) Nevertheless, Nemec claims that over the ensuing months, Reichenbach repeatedly asked him to move to a floater position. (Id. at 59.)

On October 9, 2013, Hedden visited the Hermantown pharmacy. While there, he observed Nemec using a "very large" stack of pre-printed medication leaflets to attach to prescription bags – thereby skipping the step of POM 1009 in which the pharmacist verifies the dispensed medication by comparing it to an image on the computer and then printing the leaflet to be attached to the bag. (Hedden Dep. at 44-49; Nemec Dep. at 107-08.) Notably, Nemec does not dispute he was not in compliance with POM 1009 or that he was not comparing dispensed medication to the computer images. (Nemec Dep. at 110, 122-23.) Hedden asked Nemec why he was processing prescriptions in this fashion, but the exact content of this conversation is somewhat unclear.

According to Hedden, he inquired if Nemec was doing so in order to be faster and more efficient, and Nemec said yes. (Hedden Dep. at 49.) Hedden then told him this

---

other floaters who were "much younger" than him, although he could not recall their names. (Nemec Dep. at 100; see also Reichenbach Dep. at 167 (confirming that he supervised several staff pharmacists who were younger than 50).)

[5] Reichenbach testified in his deposition that he broached the subject because he felt Nemec "couldn't handle" the job of pharmacy manager. (Reichenbach Dep. at 80.)

practice was not in compliance with Wal-Mart's procedures, was unsafe, and needed to stop. (Id. at 49-50.) Nemec, by contrast, recalls telling Hedden he was using this process for increased speed and efficiency. Hedden responded that it "scared" him but he would not tell Nemec "how to do your business," and it would not be a problem once the Hermantown pharmacy switched to the new "Bagging Phase III" process. (Nemec Dep. at 149-50.) He claims Hedden never expressly told him to stop printing multiple leaflets at once or that doing so violated POM 1009. (Id.)[6]

Regardless, Hedden told Reichenbach what he had observed and asked him to "look into the situation." (Reichenbach Decl. Ex. 1; see also Reichenbach Dep. at 89-90.) Reichenbach reviewed security video of the pharmacy from October 9, which confirmed Hedden's account of the manner in which Nemec was processing prescriptions. (Reichenbach Decl. Ex. 1; Reichenbach Dep. at 94-96.) He told Hedden that he believed Nemec was violating POM 1009 but that Nemec's conduct did not "appear to signify a 'blatant disregard for SOP' as explained by" Wal-Mart's Health and Wellness "Professional Accountability Matrix," a Wal-Mart policy listing appropriate discipline for different types of infractions by pharmacy staff. (Reichenbach Decl. Ex. 1; Brandt Decl. Ex. O.) According to the Matrix, a "[b]latant disregard for standard

[6] In its Reply, Wal-Mart argues Nemec is trying to create a sham fact issue because, in his deposition, he "was given several opportunities to deny that Hedden told him to stop violating the visual verification policy, and he very clearly testified that he could not deny it because he could not remember." (Reply at 4.) This is simply wrong. What Nemec testified he could not recall was whether Hedden "specifically told you that you were *violating the policy or the POM*?" (Id. at 163 (emphasis added); accord id. at 150.) This is different than being told to *stop* violating the policy. And when Nemec was pointedly asked in his deposition, "[w]hen [Hedden] indicated to you . . . that what you were doing scared him, *did he tell you that you should not continue doing that process*?", Nemec answered, "No." (Id. at 149-50 (emphasis added).)

operating procedures" results in termination, even for a first-time offense. (Brandt Decl. Ex. O.) But because Reichenbach did not believe Nemec's conduct rose to the level of "blatant disregard," he recommended to Hedden that Nemec receive additional training and be removed as pharmacy manager but not terminated. (Reichenbach Decl. Ex. 1.)

**III. Nemec continues violating SOPs**

On November 6, 2013, Reichenbach telephoned Nemec. (Nemec Dep. at 66; Reichenbach Dep. at 99-100; Reichenbach Decl. Ex. 1.) During that conversation, he asked whether Nemec was still pre-printing multiple leaflets and Nemec responded, "No, I don't think so." (Nemec Dep. at 67.)[7] But when Reichenbach pressed and told Nemec he could review store video, Nemec responded, "I'm not sure" and "I probably have been," particularly when behind. (Id.; see also Reichenbach Dep. at 100-01.) Reichenbach told Nemec he would not have a "knee-jerk reaction" but that he was "probably going to have to terminate" Nemec's employment as a result. (Nemec Dep. at 67.) Reichenbach again asked if Nemec would be willing to transition to a floater position, but Nemec declined. (Id.; see also Reichenbach Decl. ¶ 10 (noting that Reichenbach felt "there was a possibility his employment could be saved if he offered to step down from the manager role").)

Reichenbach spoke to Hedden about his conversation with Nemec; Hedden, in turn, reached out to Manish Patel, Wal-Mart's Director of Quality Improvement, for his input, specifically whether Patel believed Nemec had engaged in "blatant disregard" of

[7] According to Reichenbach, Nemec flatly denied continuing to pre-print leaflets. (Reichenbach Dep. at 100-01.)

SOP. (Reichenbach Decl. Ex. 1; Reichenbach Dep. at 108-15.) Patel opined that Nemec had, in fact, blatantly disregarded SOP. (Reichenbach Decl. Ex. 1.) Hedden then conferred with his supervisor (Paresh Patel) and Wal-Mart's Human Resources department and determined that Nemec's employment should be terminated. (Id.)

**IV. Nemec's employment is terminated and he files suit**

On November 18, 2013, Nemec was called to a meeting with Reichenbach and David Swede, the co-manager of the Hermantown store, and informed he was being discharged due to "gross misconduct" for failing to follow Wal-Mart's SOPs. (Brandt Decl. Exs. A, P.) Nemec claims he was "stunned." In his exit interview, he told Reichenbach it was common practice for pharmacists to pre-print leaflets to save time and, in fact, a prior manager had told Nemec to print multiple leaflets at a time instead of waiting for the pharmacy's slow printers. (Nemec Decl. ¶ 13; Suronen Decl. ¶ 8; Nemec Dep. at 113, 156-57.) But Nemec demurred when Reichenbach pressed for the names of others, claiming he "wasn't going to throw anybody else under the bus." (Nemec Dep. at 160.) Reichenbach took no steps to confirm Nemec's claims that other pharmacists were also pre-printing multiple leaflets.

At the time of his termination, Nemec was 59 years old. He was temporarily replaced by Robert Sieg, who "floated" from a Wal-Mart pharmacy in Detroit Lakes, Minnesota, until Reichenbach could find a permanent replacement; Sieg was 29 years old. (Reichenbach Dep. at 85-86; Felt Decl. Ex. 3.) Eventually, 49-year-old Janet Glisczinski was hired as the Hermantown pharmacy manager. (Felt Decl. Ex. 3.)

Nemec commenced this action in October 2014. His one-count Complaint alleges Wal-Mart terminated his employment in violation of the MHRA. With discovery complete, Wal-Mart now moves for summary judgment. The Motion has been fully briefed, the Court heard oral argument on November 25, 2015, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[8] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

---

[8] Several Eighth Circuit cases cited herein have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be sparingly granted in discrimination cases. Because this Court has cited these cases for different legal principles that remain good law, it has not indicated such abrogation.

## ANALYSIS

### I. Age-discrimination law generally

The MHRA – like its federal counterpart, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*. – renders it unlawful for an employer to discharge an employee because of his age. Minn. Stat. § 363A.08, subd. 2(2). Claims under the MHRA, like those under the ADEA, are analyzed using the familiar McDonnell Douglas burden-shifting framework. E.g., Chambers v. Travelers Cos., 668 F.3d 559, 566 (8th Cir. 2012); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1136 (8th Cir. 2006). Under that framework, a plaintiff must first establish a prima facie case of discrimination. E.g., Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012). If he does so, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 914 (8th Cir. 2007) (citations omitted).[9] Yet where a defendant has proffered a legitimate, nondiscriminatory reason for its actions, a court may simply assume the plaintiff has established a prima facie case and proceed directly to the question of pretext. E.g., Wagner v. Gallup, Inc., 788 F.3d 877, 886 (8th Cir. 2015); Anderson v. Durham D&M, L.L.C., 606 F.3d 513, 523-24 (8th Cir. 2010).

[9] This burden-shifting paradigm does not apply when the plaintiff proffers "direct evidence" of discrimination. See, e.g., Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014) (*en banc*). Nemec does not rely on direct evidence here.

Here, Wal-Mart has proffered a legitimate, nondiscriminatory reason for Nemec's discharge: his violation of the "visual verification" SOP contained in POM 1009. Accordingly, the Court need not (and will not) address the prima facie case, as it is irrelevant to the final analysis. Rather, the Court will turn directly to whether Nemec can establish Wal-Mart's proffered reason is a pretext for age discrimination.

## II. No genuine issue exists

At the third stage of McDonnell Douglas, a plaintiff must proffer sufficient evidence "for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only pretext but that it is pretext for discrimination." Wagner, 788 F.3d at 886 (citation omitted). Here, as discussed below, Nemec points to several different types of evidence in an effort to create a genuine issue whether Wal-Mart terminated his employment based on his age. In the Court's view, the evidence does not suggest age bias played a part in his termination.

Nemec first argues that in April 2013, "just months before his termination," he received a "very positive performance evaluation" which documented "no concerns." (Mem. in Opp'n at 24.) An employee's positive performance review "shortly before he was terminated" may suggest discrimination. Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006). Here, however, there was a seven-month gap between the review and Nemec's termination. Cf. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002) (favorable review "just days before" termination might be suggestive of discrimination). More importantly, it was only during that seven-month gap that Reichenbach and Hedden first learned Nemec was not complying with POM 1009. This

provides an explanation for the positive reviews that undermines any inference of discrimination. See, e.g., Anderson, 606 F.3d at 522 (while "[r]ecent positive performance evaluations sometimes may serve as evidence of pretext," they "do little for [the plaintiff's] case" where they "predated the [incidents] that immediately preceded [the] termination"); Smith, 302 F.3d at 834 ("A review without knowledge is irrelevant to whether [the defendant] really fired [the plaintiff] because of" its proffered reason.).

Nemec next argues that Reichenbach repeatedly pushed him to step down as pharmacy manager in favor of a "floater" position – a position "typically held by older pharmacists nearing or at retirement." (Mem. in Opp'n at 24.) According to Nemec, "[r]epeated inquiries about retirement are inherently age-based." (Id.) But there is *zero* evidence Reichenbach ever asked Nemec to *retire*, and in fact, the record reveals quite the opposite. Accepting as true that these conversations occurred means only that Reichenbach spoke to Nemec about *continuing to work for Wal-Mart* – just in a different capacity, namely, as a floater versus pharmacy manager. Moreover, the record does not support Nemec's allegation that "floater positions . . . are typically filled by retired pharmacists, or those moving into retirement." (Nemec Decl. ¶ 4.) As noted above, Nemec (allegedly) knows this only through hearsay, which the Court cannot consider at summary judgment. E.g., Novotny v. Tripp Cnty., S.D., 664 F.3d 1173, 1178 (8th Cir. 2011). In any event, he acknowledged in his deposition that he was aware of floaters who were not near retirement age, testimony which Reichenbach corroborated. (Nemec Dep. at 100; Reichenbach Dep. at 167.)

Nemec next argues that he was replaced by "significantly" younger employees. (Mem. in Opp'n at 24-25.) But while Sieg was, in fact, substantially younger than Nemec, he was only a *temporary* replacement while Reichenbach searched for a permanent pharmacy manager. "[T]he *temporary* replacement of plaintiff by younger persons is insufficient, standing alone, to give rise to an inference of discrimination." Matson v. Cargill, Inc., 618 F. Supp. 278, 283 (D. Minn. 1985) (Murphy, J.) (emphasis added); accord, e.g., Orluske v. Mercy Med. Ctr.-N. Iowa, 455 F. Supp. 2d 900, 917 (N.D. Iowa 2006) (focusing on age of permanent, not temporary, replacement). There is no evidence in the record indicating Sieg was offered the position permanently during the 6 months it took Reichenbach to find a replacement. (See Felt Decl. Ex. 8 (naming Sieg "Pharmacist in Charge" rather than "Pharmacy Manager"); Reichenbach Dep. at 85-86.) Moreover, while Nemec's permanent replacement (Glisczinski) was younger than him (49 versus 59), this age gap is not particularly telling. See, e.g., Carraher v. Target Corp., 503 F.3d 714, 719 (8th Cir. 2007) ("Although Carraher was replaced by someone . . . 28 years younger, we have previously held that this fact, though necessary to establish a prima facie case, possesses insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against.") (internal quotation marks and citations omitted); Girten v. McRentals, Inc., 337 F.3d 979, 982 (8th Cir. 2003) (nine-year age disparity likely insufficient to make out even a prima facie case of age discrimination).

Next, Nemec argues that Wal-Mart deviated from its policies in "its rush to terminate" him. (Mem. in Opp'n at 25-26.) In particular, he notes Wal-Mart has a progressive discipline policy for its employees generally, as well as one for pharmacy

employees in particular, which provide for coaching and additional training before termination, but these policies were not followed. (Id.)

To be sure, an employer's failure to follow its own policies may be indicative of pretext. See, e.g., Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 871 (8th Cir. 2009). But Nemec acknowledges that Wal-Mart's Professional Accountability Matrix provides for termination, *for a first offense*, in cases of "[b]latant disregard for standard operating procedures." (Id. at 25-26 (citing Brandt Decl. Ex. O).) Here, Reichenbach first recommended that Nemec receive coaching because his initial opinion was that Nemec's violation of POM 1009 was not "blatant disregard" for company policy. It was only after Nemec spoke with Hedden, and Reichenbach then followed up and learned Nemec was continuing to pre-print leaflets in violation of company policy, that Reichenbach concluded Nemec's conduct was blatant and deserved termination. The Court perceives no deviation by Wal-Mart, let alone one suggestive of discrimination.[10]

Nemec responds that Hedden never informed him that he needed to stop pre-printing leaflets. (Mem. in Opp'n at 26.) While that may or may not be true, it is also irrelevant, for two reasons. First, Nemec does not question that he was required to comply with POM 1009 and all other Wal-Mart SOPs in the POM – in other words, whether he actually knew what was in POM 1009, or whether he knew he was violating

[10] This, too, undercuts the contention of Nemec's counsel at oral argument: had Nemec's violation of company policy been significant enough to warrant termination, Hedden would have immediately fired him on October 9, 2013, after witnessing him using pre-printed leaflets. The record reveals that Nemec's managers considered his violation of POM 1009 extremely serious but did not warrant his immediate termination because they believed his violation was not in "blatant disregard" of company policy. Only after it appeared Nemec was continuing to violate policy was it determined his conduct was blatant and justified his discharge.

it, is immaterial. (Nemec Dep. at 23-25; Brandt Decl. Ex. E.) Second, and more importantly, it is *undisputed* that Hedden and Nemec had a conversation about the use of pre-printed leaflets in which Hedden told Nemec the practice "scared" him. (Nemec Dep. at 149-50.) Hedden testified that he directed Nemec to stop, while Nemec disputes that testimony. But the issue is not whether such a directive actually was given; rather, the question is whether the decisionmakers – Hedden and Reichenbach – honestly *believed* Nemec had been told to stop pre-printing leaflets, but nevertheless continued to do so. See, e.g., Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1002 (8th Cir. 2012) (the "critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge"). And here, in the Court's view, the record creates no genuine issue on this question, particularly given the admitted nature of the conversation between Hedden and Nemec and its contemporaneous documentation. (See Reichenbach Decl. Ex. 1.)[11]

Nemec also argues that certain other, younger pharmacists in Hermantown and elsewhere in the region (Glisczinski, Karen Cameron, and Brian Truax) were permitted progressive discipline while he was not. (Mem. in Opp'n at 17-18.) Putting aside that

[11] Nemec also argues that if POM 1009 were "truly . . . mandatory, . . . then why did Reichenbach neglect to investigate" Nemec's assertion "that many other pharmacists" also pre-printed leaflets? (Mem. in Opp'n at 26.) According to Nemec, it was because Wal-Mart was "selectively enforcing the policy" against him. (Id.) But the record reveals a far less nefarious reason: Reichenbach asked Nemec to identify others engaged in the same practice, but he declined to do so. (Nemec Dep. at 160.) In any event, as this Court has noted previously, "the appropriate scope of an internal investigation . . . is a business judgment, and we do not review the rationale behind such a decision." Ketchum v. St. Cloud Hosp., 994 F. Supp. 2d 1012, 1020 n.8 (D. Minn. 2014) (Kyle, J.) (quoting Pulczinski, 691 F.3d at 1005).

two of these individuals were not pharmacy managers, see, e.g., Knight v. Auto Zone, Inc., 494 F.3d 727, 734 (8th Cir. 2007) ("To be able to introduce evidence comparing the plaintiff to other similarly situated employees in a discrimination case, the other employees must have been 'similarly situated to the plaintiff in all relevant aspects.'") (citation omitted), there is no indication any of these pharmacists was believed by Wal-Mart to have *blatantly* disregarded procedures after being told to stop. And while Nemec claims that Glisczinski's transgression – a violation of the federal HIPAA statute concerning patient privacy – was viewed by co-store-manager Swede as "gross misconduct" worthy of immediate termination (Mem. in Opp'n at 17-18), he proffers no evidence that the relevant decisionmakers here, Hedden and Reichenbach, viewed it in the same fashion.

Next, Nemec claims that another "older" pharmacist (Richard Miller) was "fired under similar circumstances," and yet another "older" pharmacist (Wayne Suronen) "felt forced to retire" by Reichenbach, which together constitute a "pattern of discriminatory conduct." (Mem. in Opp'n at 27-28.) A plaintiff may indeed rely upon discriminatory conduct toward others in an attempt to show he was the victim of discrimination himself. See, e.g., Quigley v. Winter, 598 F.3d 938, 951 (8th Cir. 2010) (noting that in Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 386-88 (2008), the Supreme Court "considered the admissibility of so-called 'me too' evidence in an employment discrimination case" and held that "such evidence was neither per se admissible nor per se inadmissible"). But to do so, he must show his circumstances are substantially similar to the other alleged victims of discrimination. Id. ("The question of whether evidence of

discrimination [against other employees] . . . is relevant in an individual [age-discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."). Factors to be considered include whether the other alleged discriminatory behavior is close in time to the events at issue in the plaintiff's case; whether the same decisionmakers were involved; whether the other employee and the plaintiff were treated in a similar manner; and whether the employee and the plaintiff were otherwise similarly situated. See, e.g., Anderson v. Phelps Mem'l Health Ctr., No. 8:13CV362, 2015 WL 6829056, at *11 (D. Neb. Nov. 6, 2015) (quoting Barnett v. PA Consulting Grp., Inc., 35 F. Supp. 3d 11, 22 (D.D.C. 2014)).

Here, the record simply does not show substantial similarity between Nemec's situation and either Miller's or Suronen's. Miller was fired after coming into work to fill a personal prescription despite being on a leave of absence. (See Mem. in Opp'n at 14-15.) He was not a pharmacy manager, but rather a staff pharmacist (floater), and his misconduct was reported by his pharmacy manager, Cari LaBonne – and it is *LaBonne*, according to Miller, who was focused on his age. (See id. at 16.) As for Suronen, he was a floater who claims he felt "pushed into retirement" in 2012 after Reichenbach demanded he repay reimbursement he had been receiving for mileage. (Id. at 27.) These circumstances, too, are quite dissimilar from Nemec's.[12] Most importantly, there is no

[12] Suronen claims that when he challenged Reichenbach about the procedure for mileage reimbursement and asserted he had always received reimbursement, Reichenbach responded, "you old guys maybe don't know about that." (Suronen Decl. ¶ 14.) Even if this statement were made, it is simply too divorced from Nemec's circumstances to be anything other than a stray

evidence in the record suggesting that either of these individuals was accused of blatantly disregarding a Wal-Mart policy, particularly one involving patient safety, as was Nemec.

Nemec next argues that Wal-Mart has offered shifting explanations for his termination. (Mem. in Opp'n at 28.) True, an employer's shifting reasons for an employee's discharge can be probative of discrimination. See, e.g., Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1001 (8th Cir. 2011). But changes to the proffered reason are only probative if the discrepancy is substantial. Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (*en banc*); Morris v. City of Chillicothe, 512 F.3d 1013, 1019 (8th Cir. 2008). Stating a proffered reason in different wording or explaining additional aspects of the reason are not substantial changes. See Loeb v. Best Buy Co., 537 F.3d 867, 873 (8th Cir. 2008); Smith, 302 F.3d at 835.

This is all Nemec has proffered here. He argues Wal-Mart only now points to his violation of Minnesota's administrative pharmacy rules as a way to buttress its termination decision, but those rules simply mirror POM 1009. There is no contradiction in Wal-Mart noting that Nemec's conduct violated *both* its standard procedures *and* Minnesota law. Nemec also argues that at various times Reichenbach and Hedden have suggested the reason for Nemec's discharge was "bagging issues." (Mem. in Opp'n at 28.) But while it is true POM 1010 (not POM 1009) is expressly directed at "Bagging," it is undisputed that POM 1009 repeatedly references bagging – which makes eminent sense, as the visual-verification process to which POM 1009 is directed occurs

---

remark. See, e.g., Simmons v. Oce-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999) (remarks "unrelated to the decisional process," especially those remote in time, are stray remarks that "do not support a finding of pretext for intentional . . . discrimination").

immediately before medication is *placed in a bag* and a leaflet is stapled to it. (See Brandt Decl. Ex. J (revealing that POM 1009 includes "validat[ing] each item *in the bag* individually" and then "[p]lac[ing] all vials/containers *back on the bag*") (emphases added).) It is hardly surprising, then, that Hedden and Reichenbach might have referred to Nemec's conduct as presenting a "bagging issue." The Court perceives no inconsistency or change in Wal-Mart's reason for terminating Nemec's employment that would suggest discrimination.

Lastly, Nemec argues that Reichenbach and Hedden "willfully exaggerated" his (mis)conduct and "callously" ignored the "explanation offered by Nemec in support of his actions." (Mem. in Opp'n at 29.) This argument is a difficult one to accept, given that Nemec himself repeatedly acknowledged in his deposition that his conduct violated POM 1009 (as well as Minnesota law) – conduct that indisputably entitled Wal-Mart to terminate his employment. (See Nemec Dep. at 110, 130.) Nor does Nemec cite any Wal-Mart rule or other internal procedure mandating that the company conduct a further investigation in light of the reasons and explanations he offered to Reichenbach. As already noted, "the appropriate scope of an internal investigation . . . is a business judgment, and we do not review the rationale behind such a decision." Ketchum v. St. Cloud Hosp., 994 F. Supp. 2d 1012, 1020 n.8 (D. Minn. 2014) (Kyle, J.) (quoting Pulczinski, 691 F.3d at 1005). Even if Wal-Mart were quick to act, it enjoyed the license to be impetuous, as long as it was not engaged in intentional discrimination. It is not this Court's job to sit as a "super-personnel department" and second-guess the wisdom of Wal-Mart's decision not to undertake further investigation. Anderson, 606 F.3d at 522.

## CONCLUSION

All told, whether taken individually or cumulatively, the evidence cited by Nemec fails to create a genuine issue that Wal-Mart's proffered reason for terminating his employment was a pretext for age discrimination. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Wal-Mart's Motion for Summary Judgment (Doc. No. 37) is **GRANTED** and Nemec's Complaint (Doc. No. 1, Ex. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: December 10, 2015

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge